No. 23-2713

# In The United States Court of Appeals For The Seventh Circuit

COYLE NISSAN, LLC,

*Plaintiff-Appellant,*

v.

NISSAN NORTH AMERICA, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 4:18-cv-75-TWP-TAB

The Honorable Tanya Walton Pratt

## BRIEF OF DEFENDANT-APPELLEE

Steven J. Wells
Jennifer Coates
Brock Huebner
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(612) 340-2600

*Counsel for Defendant-Appellee*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellee furnishes the following statement in compliance with Circuit Rule 26.1:

1) The full name of every party that the attorney represents in the case:

   Nissan North America, Inc.

2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Dorsey & Whitney LLP; Taft Stettinius & Hollister LLP.

3) If the party is a corporation:

   (a)  Identify all its parent corporations, if any:

        Defendant-Appellee Nissan North America, Inc. is a direct, 100%-owned subsidiary of Nissan Motor Co., Ltd., a Japanese corporation.

   (b)  List any publicly held company that owns 10% or more of the party's stock:

        Renault S.A. owns more than 10% of Nissan Motor Co., Ltd.

December 18, 2023                          DORSEY & WHITNEY LLP


                                           */s/ Steven J. Wells*
                                           Counsel for Defendant-Appellee

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................1

INTRODUCTION ...............................................................2

STATEMENT OF THE ISSUES .................................................4

STATEMENT OF THE CASE ....................................................5

    A.    NNA and Coyle execute a contract tailored to their mutual desire for satisfactory permanent dealership facilities. .................5

    B.    Coyle fails to identify and acquire a satisfactory dealership site, despite NNA's advice and assistance......................................8

    C.    Despite NNA's assistance and concessions, Coyle sues NNA ..... 12

    D.    The parties file supplemental pleadings and counterclaims after NNA discovers Coyle's development of the Broadway Site for its Chevrolet-Buick-GMC dealership ............................ 13

    E.    The jury verdict in favor of NNA provokes post-trial motions and Rule 59(e) relief for NNA on its declaratory judgment counterclaim ................................................. 14

SUMMARY OF THE ARGUMENT ................................................. 17

ARGUMENT ................................................................. 20

I.    The District Court Properly Dismissed Coyle's Breach of Fiduciary Duty Claim (Count IV) ......................................... 20

    A.    Standard of Review................................................... 20

    B.    No fiduciary duties are owed between parties in typical arm's length business relationships, including between franchisors and franchisees......................................... 21

    C.    The relevant contractual terms and pleading allegations provide no basis to impose a fiduciary duty on NNA................... 24

D.     Indiana's comprehensive statutory scheme governing vehicle manufacturers and dealers further negates the judicial imposition of fiduciary duties on NNA ............................ 27

E.     Appellant's reliance on irrelevant allegations and inapposite case law fails to justify imposing a fiduciary duty on NNA ........................................................................ 28

II.    The District Court Properly Granted Summary Judgment Against Coyle's Contractual and Statutory Claims .............................. 31

A.     Standard of Review ........................................................ 31

B.     There was no genuine issue of material fact on Coyle's contract claims (Counts I & III) .................................... 32

1.    Both of the contract claims required Coyle to demonstrate evidence of NNA's bad faith in exercising its discretion under the DSSA ........................... 34

2.    NNA's review and ultimate approval of Coyle's proposed sites complied with the DSSA's terms and did not constitute bad faith ................................. 36

3.    Appellant's other allegations also fail to demonstrate any breach of the DSSA or bad faith by NNA ................... 41

C.     There was no genuine issue of material fact on Coyle's IDFPA and ADDCA claims (Counts V and X) ............................. 43

1.    None of NNA's interactions or communications with Coyle constituted bad faith or coercive threats in violation of the IDFPA or ADDCA ..................................... 45

2.    Both the IDFPA and ADDCA claims independently fail because Coyle was not prejudiced or damaged by NNA's actions .................................................... 49

III.   The District Court Properly Granted the Rule 59(e) Motion to Correct an Error of Law on the Declaratory Judgment Counterclaim ................................................................................ 51

A.     Standard of Review ........................................................ 51

iv

B.    The district court did not abuse its discretion in concluding that it had erred when it initially granted Coyle's oral Rule 50 motion on the ground that NNA's declaratory judgment counterclaim was duplicative .......................................................... 52

    1.    NNA asserted a valid declaratory judgment counterclaim under 28 U.S.C. § 2201 ................................ 52

    2.    The district court improperly granted Coyle's last-minute motion for judgment as a matter of law on the declaratory judgment counterclaim .................................... 54

    3.    NNA demonstrated that its declaratory judgment counterclaim was not duplicative and the district court properly granted Rule 59(e) relief to correct its legal error ............................................................................ 55

CONCLUSION .................................................................................... 58

# TABLE OF AUTHORITIES

**Cases**                                              **Page(s)**

*Adams v. Raintree Vacation Exchange, LLC,*
   702 F.3d 436 (7th Cir. 2012)........................................................ 43

*American Motors Sales Corp. v. Runke,*
   708 F.2d 202 (6th Cir. 1983)........................................................ 40

*Amoco Oil Co. v. Cardinal Oil Co.,*
   535 F. Supp. 661 (E.D. Wis. 1982) ............................................. 26

*ARA Auto. Grp. v. Cent. Garage, Inc.,*
   124 F.3d 720 (5th Cir. 1997)........................................................ 20

*Arnott v. American Oil Co.,*
   609 F.2d 873 (8th Cir. 1979)........................................................ 26

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................... 17

*Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc.,*
   No. 13-cv-11213, 2014 U.S. Dist. LEXIS 35909 (D. Mass. Mar.
   18, 2014) ...................................................................................... 25

*Autohaus Brugger, Inc. v. Saab Motors, Inc.,*
   567 F.2d 901 (9th Cir. 1978)........................................................ 40

*Bedford Nissan, Inc. v. Nissan N. Am., Inc.,*
   No. 1:16 CV 423, 2016 U.S. Dist. LEXIS 149762 (N.D. Ohio
   Oct. 28, 2016) ...................................................................... 20, 24

*Berger v. Xerox Corp. Ret. Income Guarantee Plan,*
   338 F.3d 755 (7th Cir. 2003)........................................................ 50

*Berry Bros. Buick, Inc. v. Gen. Motors Corp. (Buick Motor
   Division),* 257 F. Supp. 542 (E.D. Pa. 1966) .............................. 43

*Boat & Motor Mart v. Sea Ray Boats, Inc.,*
   825 F.2d 1285 (9th Cir. 1987)...................................................... 17

*Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,*
   212 F. Supp. 2d 233 (S.D.N.Y. 2002) ......................................... 45

*Brooks v. Pactiv Corp.*,
729 F.3d 758 (7th Cir. 2013)........................................................ 16

*Broussard v. Meineke Disc. Muffler Shops*,
155 F.3d 331 (4th Cir. 1998)............................... 19, 20, 22, 23

*Builders Nab LLC v. FDIC*,
922 F.3d 775 (7th Cir. 2019)................................................ 30, 37

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal, Inc.*,
826 P.2d 710 (Cal. 1992).............................................................. 38

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
474 F.3d 463 (7th Cir. 2007)...................................................... 17

*Cincinnati Life Ins. Co. v. Beyrer*,
722 F.3d 939 (7th Cir. 2013)...................................................... 47

*Colley v. Ind. Farmers Mut. Ins. Grp.*,
691 N.E.2d 1259 (Ind. Ct. App. 1998)...................................... 41

*Doemer v. Callen*,
847 F.3d 522 (7th Cir. 2017)................................................ 17, 25

*Dreiling v. Peugeot Motors of America, Inc.*,
850 F.2d 1373 (10th Cir. 1988)................................................. 40

*Ed Houser Enters., Inc. v. Gen. Motors Corp.*,
595 F.2d 366 (7th Cir. 1978)............................................... 42, 44

*Elder Care Providers of Ind., Inc. v. Home Instead, Inc.*,
No. 1:14-cv-01894-SEB-MJD, 2017 U.S. Dist. LEXIS 42792
(S.D. Ind. Mar. 24, 2017) ........................................................... 40

*Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*,
814 F.2d 90 (2d Cir. 1987) ......................................................... 40

*Erie Ins. Co. v. Hickman*,
622 N.E.2d 515 (Ind. 1993)........................................................ 40

*Eventbrite, Inc. v. Concerts Ltd.*,
No. 20-cv-04040-SI, 2022 U.S. Dist. LEXIS 77438 (N.D. Cal.
Apr. 28, 2022) ............................................................................... 31

*Fin. Fiduciaries, LLC v. Gannett Co.*,
46 F.4th 654 (7th Cir. 2022) ........................................ 47

*FLB, LLC v. Cellco P'ship*,
536 F. App'x 132 (2d Cir. 2013) .................................... 20

*Ford Motor Credit Co. v. Garner*,
688 F. Supp. 435 (N.D. Ind. 1988) ............................... 40

*Francis Chevrolet Co. v. General Motors Corp.*,
602 F.2d 227 (8th Cir. 1979) ........................................ 40

*Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*,
530 F. App'x 542 (6th Cir. 2013) .................................. 25

*Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*,
No. 3:09 CV 792, 2010 U.S. Dist. LEXIS 66732 (N.D. Ohio July
2, 2010) ............................................................... 25

*Gen. Motors Corp. v. Mac Co.*,
247 F. Supp. 723 (D. Colo. 1965) ................................. 43

*George Lussier Enters. v. Subaru of New Eng., Inc.*,
393 F.3d 36 (1st Cir. 2004) .......................................... 40

*Gunn v. Cont'l Cas. Co.*,
968 F.3d 802 (7th Cir. 2020) ........................................ 43

*Guz v. Bechtel Nat'l Inc.*,
8 P.3d 1089 (Cal. 2000) ........................................ 29, 32

*Jaffri v. JPMorgan Chase Bank, N.A.*,
26 N.E.3d 635 (Ind. Ct. App. 2015) ......................... 17, 18

*Kapoor v. Dybwad*,
49 N.E.3d 108 (Ind. Ct. App. 2015) ............................. 24

*Koger v. Bryan*,
523 F.3d 789 (7th Cir. 2008) ........................................ 48

*Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*,
461 F.2d 608 (7th Cir. 1972) ................................... 39, 40

*Mahaffey v. Ramos,*
588 F.3d 1142 (7th Cir. 2009) ........................................................6

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,*
244 F.R.D. 204 (S.D.N.Y. 2007) ................................................... 25

*Mattei v. Hopper,*
330 P.2d 625 (Cal. 1958) ............................................................... 31

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
312 U.S. 270 (1941) ....................................................................... 49

*MH Pillars Ltd. v. Realini,*
277 F. Supp. 3d 1077 (N.D. Cal. 2017) ........................................ 20

*Midwest Minerals, Inc. v. Wilson,*
983 N.E.2d 1180 (Ind. Ct. App. 2013) .......................................... 52

*Modrowski v. Pigatto,*
712 F.3d 1166 (7th Cir. 2013) ....................................................... 28

*Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.,*
600 F.3d 878 (7th Cir. 2010) ......................................................... 28

*Oasis West Realty, LLC v. Goldman,*
250 P.3d 1115 (Cal. 2011) ............................................................. 29

*Original Great Am. Chocolate Chip Cookie Co., Inc. v. River
Valley Cookies, Ltd.,* 970 F.2d 273 (7th Cir. 1992) ................. 19, 26

*Peretz v. Sims,*
662 F.3d 478 (7th Cir. 2011) ......................................................... 45

*Pizza Mgmt., Inc. v. Pizza Hut, Inc.,*
737 F. Supp. 1154 (D. Kan. 1990) ................................................ 26

*R.D. Imports Ryno Indus., Inc. v. Mazda Distributors (Gulf), Inc.,*
807 F.2d 1222 (5th Cir. 1987) ....................................................... 40

*R.R. St. & Co. v. Vulcan Materials Co.,*
569 F.3d 711 (7th Cir. 2009) ......................................................... 48

*Ray Skillman Oldsmobile & GMC Truck, Inc. v. GMC*,
    No. l:05-cv-0204-DFH-WTL, 2006 U.S. Dist. LEXIS 26142
    (S.D. Ind. Mar. 14, 2006) ...................................................... 18, 24

*Rea v. Ford Motor Co.*,
    497 F.2d 577 (3d Cir. 1974) .................................................. 40

*Richard I. Spiece Sales Co. v. Levi Strauss N. Am.*,
    19 N.E.3d 345 (Ind. Ct. App. 2014) .................................... 18, 24

*Rindlisbacher v. Steinway & Sons Inc.*,
    497 F. Supp. 3d 479 (D. Ariz. 2020) ................................... 27

*Romo v. Gulf Stream Coach, Inc.*,
    250 F.3d 1119 (7th Cir. 2001) .............................................. 47

*RPM, Inc. v. Oatey Co.*,
    2005-Ohio-1280 (Ohio Ct. App. Mar. 23, 2005) ................. 27

*Sri Shirdi Saibaba Sansthan of Tristate, Inc. v. Farmers State
    Bank of Alto Pass, Ill.*, 194 N.E.3d 55 (Ind. Ct. App. 2022) ........... 18, 20, 24

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    122 Cal. Rptr. 2d 267 (Cal. Ct. App. 2002) ....................... 31

*Strawflower Elecs., Inc. v. Radioshack Corp.*,
    No. C-05-0747 MMC, 2005 U.S. Dist. LEXIS 45205 (N.D. Cal.
    Sept. 20, 2005) ..................................................................... 27

*Towne v. Robbins*,
    339 F. Supp. 2d 1105 (D. Or. 2004) ..................................... 26

*Trade Fin. Ptnrs, LLC v. AAR Corp.*,
    573 F.3d 401 (7th Cir. 2009) ....................................... 27, 28, 38

*Waldridge v. American Hoechst Corp.*,
    24 F.3d 918 (7th Cir. 1994) ................................................ 28

*Walker v. U-Haul Co.*,
    734 F.2d 1068 (5th Cir. 1984) ............................................. 25

*Wheeler v. Hronopoulos*,
    891 F.3d 1072 (7th Cir. 2018) ............................................. 30

*Winamac Southern Ry. v. Toledo,*
    No. 3:09-CV-86, 2012 U.S. Dist. LEXIS 95015 (N.D. Ind. July
    9, 2012) ........................................................................................ 49

*York v. Fredrick,*
    947 N.E.2d 969 (Ind. Ct. App. 2011) ......................................... 18

## Statutes

15 U.S.C. § 1221(e) ............................................................................ 39

15 U.S.C. § 1222 ................................................................... 39, 45, 46

28 U.S.C. § 2201 ................................................................... 10, 48, 54

Ind. Code § 9-32-11-20 ............................................................. 21, 36

Ind. Code § 9-32-13-27 ................................................................ 50, 51

Ind. Code § 9-32-13-31 ....................................................................... 51

Ind. Code § 23-2-2.5-1 ....................................................................... 19

Ind. Code § 23-2-2.7-1 ....................................................................... 50

Ind. Code § 23-2-2.7-2(1)(iv) ............................................. 39, 40, 45, 46

Ind. Code § 23-2-2.7-5 ....................................................................... 19

## Other Authorities

Fed. R. Civ. P. 12(b)(6) ................................................................ 16, 17

Fed. R. Civ. P. 50 ....................................................... 12, 13, 50, 53

Fed. R. Civ. P. 54(d)(1) ....................................................................... 12

Fed. R. Civ. P. 59(e) ................................................................. *passim*

# JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement omitted its LLC members' names, Dkt. No. 14, but is otherwise complete and correct.

**INTRODUCTION**

In 2012, Coyle Nissan, LLC ("Appellant" or "Coyle") became an authorized Nissan dealer when Coyle, owned by longtime Chevrolet-Buick-GMC dealership operators Chris and Michael Coyle, voluntarily entered into a Nissan Dealer Sales and Service Agreement ("DSSA") with Nissan North America, Inc. ("Appellee" or "NNA"). As the DSSA reflects, both parties understood and acknowledged that Coyle's proposed existing dealership facilities (a construction trailer) were completely inadequate for a Nissan dealership, and they agreed that Coyle would acquire and build new dealership real estate and facilities that met the DSSA's requirements within three years. Coyle agreed that, if it failed to meet these facilities deadlines and requirements, it would sell its dealership.

One of those requirements—a requirement unmentioned in Appellant's Brief but at the heart of the parties' disagreement—was that the site of the new dealership be in a location "reasonably equivalent" to that of NNA's principal competitors. It was undisputed that all of NNA's principal competitors (such as Honda and Toyota) in the Clarksville, Indiana area had dealership locations that enjoyed full visibility and access from major thoroughfares. Despite that requirement, Coyle repeatedly proposed a site lacking such required access and visibility, on land (the "Broadway Site") located *behind* the Coyles' existing Chevrolet-Buick-GMC dealership. NNA

first rejected that site as failing to meet NNA's requirements even before the DSSA was signed, and, over a period of several years after entering into the DSSA, reiterated the site's shortcomings each time Coyle re-proposed it.

Over the next five years, NNA granted Coyle extension after extension of the DSSA deadlines, paid for a real estate consultant to assist Coyle in finding an acceptable location, and approved two locations proposed, then abandoned, by Coyle itself. Finally, frustrated with Coyle's inability to find a mutually satisfactory site and Coyle's continued sales operation out of a triple-wide trailer, NNA agreed to approve the mediocre Broadway Site and give Coyle yet another extension to construct a new facility. NNA's reward for its patience, financial assistance and compromise was this lawsuit. Coyle has never built the new dealership facilities it agreed to construct in 2012.

The district court properly dismissed all of the claims set forth in Coyle's Amended Complaint at the pleadings stage or upon summary judgment. While the summary judgment motion was pending, NNA learned that not only had Coyle failed to begin building a new Nissan dealership on the Broadway Site as it had agreed, Coyle instead developed that site for the benefit of its Chevrolet-Buick-GMC dealership. When NNA appropriately notified Coyle that its non-approved use breached the parties' agreement, Coyle filed a supplemental Complaint accusing NNA of a new breach, and NNA counterclaimed. After reviewing extensive evidence that Coyle lacked

any intent to use the Broadway Site for a Nissan dealership as it had contracted, the jury rejected all of Coyle's breach claims and found that Coyle—not NNA—had breached its contract. After trial, and in light of the jury's factual findings, the district court granted NNA's Rule 59 motion to reinstate NNA's declaratory judgment counterclaim and declare that Coyle breached the DSSA.

The district court's final judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.      Did the district court properly dismiss the breach of fiduciary duty claim when Appellant's amended complaint and the contractual terms establish that this dispute is between two commercial entities engaged in an arm's length business transaction?

2.      Did the district court properly grant summary judgment on the breach of contract and breach of good faith and fair dealing claims in the absence of evidence that Appellee acted in bad faith?

3.      Did the district court properly grant summary judgment on the Indiana Deceptive Franchise Practices Act and federal Automobile Dealers Day in Court Act claims given the absence of evidence of any wrongful threat or extra-contractual demand by Appellee?

4.      Did the district court properly grant Appellee's Rule 59(e) motion to correct an error of law and impose judgment against Appellant on Appellee's declaratory judgement counterclaim?

## STATEMENT OF THE CASE

**A.    NNA and Coyle execute a contract tailored to their mutual desire for satisfactory permanent dealership facilities.**

Coyle is an Indiana limited liability company that owns car dealerships in the Clarksville and Jeffersonville, Indiana area. ECF 46 ¶¶ 2, 6-7. NNA distributes new motor vehicles and related products to its authorized dealers. *Id.* ¶ 3.

In July 2012 after Coyle purchased a Jeffersonville Nissan dealership, Coyle and NNA entered into the DSSA. ECF 46-1.[1] In addition to containing standard terms governing the mutual responsibilities and duties between a manufacturer and dealership, *id.* at 16-50, the DSSA between Coyle and NNA also included terms specific to the unique dealership facility issues known to the parties at the time of contract formation. ASA 8-11. Such provisions were necessary because at the time of the DSSA, the parties agreed that Coyle's existing dealership facilities—a triple-wide trailer—did not meet NNA's standards for a Nissan dealership. *Id.* at 8 ("Dealer acknowledges that the Approved Temporary Facilities do not currently comply with Nissan's Facility Usage Policy, do not meet the appearance,

---

[1] For convenience of the Court, the DSSA provisions directly relevant to this dispute are included in Appellee's Supplemental Appendix ("ASA") at 1-35.

layout, and guides required by [NNA], and are not acceptable to [NNA] for use on a permanent basis.").

The parties accordingly agreed to Article Twelfth of the DSSA, which designated the existing location as the "Temporary Facilities," *id.* at 8, and set forth various aspects that were required for a permanent location with "competitive dealership facilities to effectively market Nissan Products and the Nissan brand." *Id.* at 9. Coyle was obligated to acquire a permanent location "so as to provide exclusive, separate and distinct (stand-alone) Nissan dealership facilities of a size, appearance and layout meeting [NNA]'s approval and in accordance with the Guides established by [NNA], all in accordance with final architectural plans to be submitted to [NNA] for approval . . ." and also complying with the Nissan Retail Environmental Design Initiative ("NREDI") guidelines for all Nissan dealerships. *Id.*

Other provisions of the DSSA further defined the standards required for a permanent "Dealership Location and Dealership Facilities." ASA at 16. Importantly, the location and facilities were required to be "reasonably equivalent to those maintained by Dealer's principal competitors in the geographic area in which Dealer's Primary Market Area is located." *Id.* Further, the facilities "shall be satisfactory in space, appearance, layout, equipment, signage and otherwise be substantially in accordance with the Guides therefor established by Seller from time to time." *Id.* The provisions

also acknowledged that circumstances and requirements may change over time, granting NNA the right to "periodically evaluate Dealer's performance of its responsibilities under this Section" giving consideration to factors like "the location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area; equivalence with facilities maintained by Dealer's principal competitors" and other factors "directly relate[d] to Dealer's performance of its responsibilities." *Id.* NNA would provide Coyle "an opportunity to comment, in writing, on such evaluations, and [NNA] will consider [Coyle]'s comments." *Id.*

The parties agreed in the DSSA to various deadlines between September 2013 and June 2015 for Coyle to identify and acquire a location meeting the DSSA requirements, and build and open a new dealership. *Id.* at 9. Under the terms of the DSSA, Coyle explicitly "acknowledges that [NNA] has relied on [Coyle's] commitment to timely meet the facility obligations in entering into this Agreement; therefore, failure by [Coyle] to meet them shall constitute a material breach of this Agreement and grounds for its termination." *Id.* at 9. Accordingly, if Coyle failed to meet the deadlines, "[Coyle] freely and voluntarily agrees to sell all of its Nissan dealership assets or otherwise transfer its ownership interest in the Nissan dealership operations." *Id.* at 10.

**B.** **Coyle fails to identify and acquire a satisfactory dealership site, despite NNA's advice and assistance**

Starting before the DSSA was finalized, and continuing for years afterwards, NNA provided ongoing guidance to help Coyle identify a satisfactory location. For example, even prior to entering into the DSSA, Coyle sought NNA's approval for the Broadway Site, a parcel of land that, from the perspective of the main thoroughfare, was located *behind* the Chevrolet-Buick-GMC dealership owned and operated by the Coyle family. ECF 109 ¶ 3. NNA informed Coyle at that time that it would not approve the Broadway Site as the permanent location given the site's poor visibility and accessibility. *Id.* at ¶ 4. As NNA explained to Coyle at multiple times, the Broadway Site was tucked behind the Coyle's Chevrolet-Buick-GMC dealership on Veteran's Memorial Parkway, so that visibility (unlike Coyle's Chevrolet-Buick-GMC facility) from that main thoroughfare was limited. *Id.*; *see also* ECF 46-4; ECF 140-6 at 3.[2] Further, the Broadway Site could only be accessed from a side street. *Id.*[3] Importantly, it was undisputed that *all* of NNA's primary competitors in the area (like Honda and Toyota) had

---

[2] This is a complete copy of the letter Coyle attached in excerpted form as Exhibit E to its Amended Complaint.

[3] At various points, Coyle claimed to be in discussions with the Town of Clarksville to extend Veteran's Parkway, but such plans were never more formalized, let alone implemented, which both Coyles acknowledged. ECF 140-2 at 110:2-111:4; ECF 140-6 at 2.

dealerships with full access and visibility from major thoroughfares. ECF 140-1 at 19:19-20:15. Accordingly, Coyle signed the DSSA with full knowledge that NNA considered the Broadway Site unsatisfactory, and the reasons why. *Id.;* ECF 109 ¶ 3-4.

On September 17, 2013, nearly two weeks after the DSSA's initial deadline for identifying a suitable site, ASA at 8-9, Coyle proposed the same Broadway Site again. ECF 46-3. NNA again rejected it as a permanent location, reiterating the site's lack of visibility and accessibility. ECF 46-4. Despite Coyle missing its contractual deadline, NNA agreed to "continue to work with [Coyle] in good faith to find an acceptable and timely long-term solution to the current facility dilemma." *Id.* NNA's concession was formalized in the Amendment 1 to the DSSA, extending the deadline for identifying a satisfactory site to July 18, 2014, and the final deadline to open new facilities to December 1, 2015. ASA at 3-7.

Coyle hired the Anderson Economic Group ("AEG") to study various sites, including the twice-rejected Broadway Site. ECF 46-2. There was no evidence that AEG, an economic consulting group, had experience in siting automobile dealerships. *See generally id.* While the resulting AEG Report ultimately recommended the Broadway Site, the Report ranked the site lowest on the characteristic of "visibility." *Id.* at 2. Coyle used the AEG Report to propose the Broadway Site yet again in the fall of 2014. ECF 140-6

at 2-3. NNA considered the AEG Report's findings, but ultimately concluded that the report arbitrarily weighed variables in its analysis. *Id.* NNA again rejected the Broadway Site, again for the same reasons, which had not changed. *Id.* Even Coyle acknowledged that Nissan's competitor brands in the area all enjoyed visibility and access to main thoroughfares, ECF 140-1 at 19:19-20:15. The Broadway Site's failings in this regard thus violated the DSSA's explicit requirement that a dealership location be "reasonably equivalent to those maintained by Dealer's principal competitors in the geographic area." ASA at 16. Another site proposed by Coyle, the "Jeff Towne Center Site," was declined because it was near an adult bookstore and in a then-underdeveloped area. ECF Nos. 126-3 at 1-2; 140-1 at 69:7-70:19.[4]

In addition to NNA's evaluations of Coyle's proposed sites, NNA provided direct assistance to Coyle to identify satisfactory locations, including hiring real estate brokers and touring prospective sites with Coyle. ECF 109 ¶¶ 7-8. NNA also shared a summary of its internal 2014 marketing study with Coyle. ECF 140-1 at 104:6-14.

---

[4] Appellant also makes cursory reference to a third "Leisure Way Site" that was included in the AEG Report. App. Br. 6-8. 29; ECF 46-2 at 1-2 (labeling Leisure Way Site as "Site 3"). The single passing reference to this site in Appellant's argument, *id.* 29, is insufficient to raise a challenge to that site on appeal. *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). Further, it is undisputed that the AEG Report rated the site lowest of the three it considered. ECF 46-2 at 2.

Significantly, between 2013 and 2017, NNA approved two separate locations proposed by Coyle, one on the west side of I-65 and one on the east side of I-65. ECF 109 ¶ 9; ECF 140-1 at 99:12-101:25, 124:5-127:6; ECF 140-2 at 57:5-8. Yet, after NNA agreed to the sites, Coyle refused to move forward, claiming that the sites it had proposed were, after all, too costly or presented other physical impediments it had not anticipated. ECF 109 ¶ 9; ECF 140-1 at 99:12-101:25, 124:15-127:6.

In the meantime, Coyle again missed the deadline to identify a satisfactory site as required in DSSA Amendment 1. ASA at 4. Yet, rather than require Coyle sell off its dealership pursuant to the DSSA's terms, NNA granted another extension. ECF 140-6. In April 2017, frustrated after nearly five years of Coyle's operation out of a trailer, failure to identify a suitable location and failure to move forward even on the sites Coyle itself proposed and NNA approved, NNA offered a further concession to Coyle and approved the Broadway Site as the location for permanent facilities. ECF 110 ¶¶ 3-4 ("After several years of searching, . . . NNA ultimately approved [the Broadway Site] as a concession to Coyle . . ."); ASA at 31 ("[NNA] is willing . . . to forego enforcement of its rights relating to" the non-compliant Temporary Facilities and Coyle's missed deadlines). As formalized in a second amendment to the DSSA ("Amendment 2"), the parties recognized that NNA had the contractual right to force Coyle's divestment of its Nissan dealership

given the years of delay and missed deadlines, but NNA agreed to yet another opportunity for Coyle to meet its contractual duties. *Id.* at 30-31. Under Amendment 2, Coyle was required to begin construction of the permanent facilities on the Broadway Site by October 1, 2017, and to complete construction within 18 months. *Id.* at 32. As with the original DSSA, Coyle explicitly agreed in Amendment 2 that a failure to meet the deadlines for constructing permanent facilities on the Broadway Site would be a "material breach" of the DSSA. *Id.* at 32-33.

### C. Despite NNA's assistance and concessions, Coyle sues NNA

After NNA compromised and approved the Broadway Site, Coyle did not start building the permanent facilities as Amendment 2 required. ECF 239-1 at 14:8-15:4. Instead, in May 2018 Coyle filed a lawsuit based on NNA's refusal to approve the Broadway Site earlier. ECF 1. As amended, Coyle's lawsuit asserted twelve causes of action for breach of contract, breach of fiduciary duty, and various claims pursuant to statutory and common law. ECF 46.

The district court granted NNA's motion to dismiss counts II, IV, VII, VIII, and IX of the Amended Complaint. Appellant's Appendix ("AA") at 31.[5] NNA subsequently moved for summary judgment on the remaining counts.

---

[5] Coyle does not appeal the dismissal of Counts II, VII, VIII, IX. *See generally* App. Br.

ECF 108. The court granted NNA's summary judgment motion in full, entering judgment for NNA on all of the remaining counts in the Amended Complaint. AA at 58.[6]

### D. The parties file supplemental pleadings and counterclaims after NNA discovers Coyle's development of the Broadway Site for its Chevrolet-Buick-GMC dealership

The filing of Coyle's lawsuit had no effect on the timeline and duties imposed by Amendment 2 and the DSSA in general, which required that Coyle begin construction of permanent facilities on or before October 1, 2017. ASA at 33. Instead of building the Nissan facility as it was contractually required, Coyle converted part of the Broadway Site to serve as a permanent parking lot for the Coyles' separately-owned Chevrolet-Buick-GMC dealership. ECF 239-6 at 161:7-165:8. This development would have required any (not-yet-built) Nissan facilities to be located outside of the location approved in Amendment 2, in other words, even further off the main thoroughfare behind the Coyle Chevrolet-Buick-GMC dealership. *Id.*

After learning of this fact in a December 2020 deposition of Chris Coyle and visiting the site to confirm, NNA formally rescinded its approval of the Broadway Site in a February 11, 2021 letter. ECF 239-5; ECF 346 at 304:16-

---

[6] Coyle also does not appeal the grant of summary judgment on Counts VI, XI, or XII. *See generally* App. Br.

322:3. In response to this letter, Coyle filed a Motion for Leave to File Supplemental Pleading, claiming that the rescission of the approval represented new, independent breaches of contract and good faith and fair dealing and violations of state law. ECF Nos. 167, 197. In its Answer to the supplemental pleading, NNA asserted two counterclaims: breach of contract; and a request for declaratory judgment under 28 U.S.C. § 2201. ECF 213. NNA did not seek monetary damages, but instead a finding of breach of contract. *Id.*

### E. The jury verdict in favor of NNA provokes post-trial motions and Rule 59(e) relief for NNA on its declaratory judgment counterclaim

Because the supplemental pleading and counterclaims were filed after the parties submitted their summary judgment briefing, the district court did not rule on those allegations in its order granting NNA summary judgment. AA at 58. Accordingly, those claims proceeded to a jury trial.

At trial, NNA presented overwhelming evidence that Coyle's actions constituted a breach of the DSSA. Such evidence conclusively demonstrated that Coyle never attempted (or even intended) to build a Nissan facility on the approved Broadway Site. *E.g.* ECF Nos. 346 at 139-145, 159-163; 347 at 203-205. NNA brought evidence that Coyle instead significantly modified the approved site, installing permanent lighting, electricity, and paving, all to serve its Chevrolet-Buick-GMC dealership rather than the Nissan facilities.

ECF Nos. 346 at 82-93, 164-66; 347 at 59-66; ASA at 51-55. The permanent

Chevrolet-Buick-GMC parking facilities would require any future Nissan

facilities to be located unacceptably removed from Veteran's Memorial

Parkway, and outside the bounds of the area agreed to in Amendment 2. ECF

346 at 86-90; ASA at 31-35, 41-50. Such a change in location was not

acceptable to NNA. ECF 346 at 86-90. Even worse, the evidence made clear

that Coyle never intended to build a Nissan facility on the site, as Coyle

never notified the Town of Clarksville that it would be using the Broadway

Site for Nissan facilities, instead consistently stating its intention to use the

site for its Chevrolet-Buick-GMC dealership. ECF 346 at 139-145, 159-163;

ASA at 36-40.

In an oral Rule 50 motion at the close of evidence at trial, Coyle for the

first time argued that judgment should be entered in its favor on NNA's

declaratory judgment counterclaim, asserting that it was duplicative of the

breach of contract counterclaim. ECF 347 at 104-112. As NNA pointed out

however, the claims were not duplicative because the declaratory judgment

claim did not require a showing of harm and further noted that a declaratory

judgment in this case would be prospectively applicable in NNA's exercise of

its termination and divestiture rights against Coyle under the Indiana

statutory scheme governing dealer terminations. *Id.* at 112-16, 120-22.

Nevertheless, the court granted Coyle's oral motion and entered judgment as

a matter of law in favor of Coyle on the declaratory judgment counterclaim. *Id.* at 127-129. The court separately granted judgment as a matter of law in favor of NNA on Count III of Coyle's supplemental pleadings. *Id.* at 131.

The remaining claims were submitted to the jury, which found for NNA on Counts I and II of Coyle's supplemental complaint. ECF 331 at 1-3.[7] On NNA's breach of contract counterclaim, the jury concluded that Coyle breached Amendment 2, but answered "No" to the question "Was [NNA] harmed by Coyle's breach of contract?" ECF 331 at 4.[8]

Both parties filed post-trial motions under Fed. R. Civ. P. 50, 54(d)(1) and 59(e). ECF Nos. 334-337. The district court resolved the post-trial motions in a July 31, 2023 Order. AA at 63-78. After granting NNA's bill of costs in part, *id.* at 70-71, the court denied both parties' Rule 50 motions and denied Coyle's Rule 59(e) motion. *Id.* at 75-77. However, the Court granted NNA's Rule 59(e) motion to amend the final judgment, concluding it made an

---

[7] Coyle does not appeal the judgment in NNA's favor on Counts I-III of Coyle's supplemental pleadings. *See generally* App. Br.

[8] Trial testimony, including statements from Appellant's witnesses and counsel, demonstrated that Coyle's years-long use of a triple-wide trailer as temporary Nissan dealership facilities harmed NNA's sales and brand image. *E.g.*, ECF Nos. 345 at 188; 346 at 98-99, 234-236, 347 at 17, 34. Accordingly, the "no harm" jury finding was apparently due to the fact that NNA did not seek monetary damages on the breach of contract claim, rather than a conclusion that NNA suffered no damages whatsoever. *See* ECF 327-1 at 23 (Final Jury Instruction No. 21 stating that "Nissan North America is not seeking monetary damages for that alleged breach.").

error of law in its previous determination that the declaratory judgment claim was duplicative of the breach of contract counterclaim. *Id.* at 77. Accordingly, the court issued an amended final judgment to conclude:

> The jury rendered its verdict on Counterclaim Count I breach of contract in favor of Counter Claimant Nissan North America, Inc. and against Counter Defendant Coyle Nissan; however, the jury determined that Nissan North America was not harmed by Coyle's breach of contract.

> Consistent with the jury's verdict, the Court enters declaratory judgment on Counterclaim Count II in favor of Counter Claimant Nissan North America, Inc. and against Counter Defendant Coyle Nissan, and the Court declares that Coyle Nissan breached Amendment No. 2 to the Nissan Dealer Sales and Service Agreement.

*Id.* at 80.

## SUMMARY OF THE ARGUMENT

When NNA and Coyle signed the DSSA, the parties entered into a reciprocal commercial relationship with each party relying on the other to fulfill its contractual duties. Central to this relationship was the parties' agreement that Coyle would locate a permanent dealership site that met the requirements of the DSSA and construct suitable facilities by deadlines imposed by the DSSA. NNA exercised its broad, but not unbounded, discretion to reject certain proposed locations because they did not meet the criteria in the DSSA. Throughout the search process, NNA offered assistance, information, and multiple extensions of the contractual deadlines. After

nearly five years of Coyle's inability to acquire a suitable alternative, NNA compromised and approved, in Amendment 2, a previously rejected site rather than exercise its rights to terminate its contract with Coyle. Coyle agreed in Amendment 2 that, in extending Coyle's deadlines, NNA was foregoing its right to require Coyle to divest its dealership, which NNA could have otherwise enforced.

Instead of complying with Amendment 2 and building a new dealership as it had promised for over five years, Coyle brought this lawsuit. Over the course of years of litigation, the district court properly rejected Coyle's various legally unfounded claims and factually unsupported allegations at the pleading stage, at summary judgment, and again after trial. All of the district court's judgments were sound and should be affirmed.

**1.** Coyle's breach of fiduciary duty claim was correctly dismissed at the pleadings stage. The terms of the DSSA demonstrated that the parties were engaged in an arm's length business relationship, which imposed no fiduciary duties as a matter of law. Coyle's claim that the DSSA was a one-sided contract of adhesion was contradicted by DSSA terms imposing mutual obligations and the inclusion of provisions that specifically addressed the rights and obligations of the parties given Coyle's then-existing dealership facilities. Coyle fails to cite any binding or persuasive case law or statutory support to impose a fiduciary duty in this context.

**2.** At summary judgment, Coyle failed to provide evidence necessary to create a genuine issue of material fact on either contractual claim. Instead, the record demonstrated that NNA's exercise of its discretion under the DSSA to approve the permanent dealership location was at all times in compliance with the terms of the DSSA and good faith. Coyle acknowledged, in Amendment 2, that its failure to meet its facilities obligations through 2017 gave NNA the right to require Coyle to divest, and Appellant's litany of alleged contractual violations asserted with little to no argument or support fail to show any error by the district court.

**3.** Coyle's claims based on state and federal statutes also failed as a matter of law, as the district court correctly determined. None of the NNA's actions constituted unlawful or coercive threats or attempts to claim extra-contractual benefits from Coyle. Instead, across the years of Coyle's missed deadlines, NNA only informed Coyle of its contractual duties and reminded Coyle of NNA's contractual remedies. Such communications fell far short of demonstrating violations of state or federal law. Further, Coyle's statutory claims independently fail for lack of evidence that the alleged violations prejudiced or damaged Coyle.

**4.** The district court did not abuse its discretion in its post-trial order on NNA's declaratory judgment claim. In light of the additional context and briefing, the district court properly determined that it committed a legal error

in previously granting judgment as a matter of law against NNA's declaratory judgment claim on the sole basis that the declaratory judgment and breach of contract claims were duplicative. After trial and upon NNA's demonstration that the claims were not duplicative, the district court properly reinstated the declaratory judgment claim and granted it based on the jury's explicit finding that Coyle breached the DSSA.

## ARGUMENT

## I. The District Court Properly Dismissed Coyle's Breach of Fiduciary Duty Claim (Count IV)

### A. Standard of Review

This Court reviews the district court's dismissal of the breach of fiduciary duty claim *de novo. See Brooks v. Pactiv Corp.*, 729 F.3d 758, 763 (7th Cir. 2013). After accepting the factual allegations as true and drawing reasonable inferences in Coyle's favor, dismissal under Rule 12(b)(6) is warranted when the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). *See* Fed. R. Civ. P. 12(b)(6). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. And when, as here, "contracts contradict the Complaint, the contracts trump the facts or allegations presented in the Complaint.*" Chi. Dist. Council*

*of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007). When considering issues of Indiana state law, this Court must predict how the Indiana Supreme Court would decide the issue today. *Doemer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017).

### B. No fiduciary duties are owed between parties in typical arm's length business relationships, including between franchisors and franchisees

"A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015) (citation omitted).[9] "Contractual agreements do not give rise to a fiduciary relationship creating a duty." *Id.* (citation omitted). "A fiduciary relationship does not exist unless there is a relationship of trust and confidence between the parties." *York v. Fredrick*, 947 N.E.2d 969, 978 (Ind. Ct. App. 2011).

---

[9] The DSSA contained a choice of law provision under which the parties agreed that "all questions concerning the validity, interpretation or performance of any of [the DSSA's] terms . . . or of any rights or obligations of the parties" shall be governed by California law. ASA at 29. As NNA argued in its motion to dismiss briefing, ECF 50 at 32-34, to the extent the choice of law provision applies to this claim, Appellant's argument also fail under California law. *See, e.g., Boat & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1292 (9th Cir. 1987) ("The relation between a franchisor and a franchisee is not that of a fiduciary to a beneficiary." (applying California law)).

Indiana law is clear that "where two seasoned commercial entities engaged in arm[']s length business transactions, there are generally no fiduciary duties created." *Ray Skillman Oldsmobile & GMC Truck, Inc. v. GMC*, No. l:05-cv-0204-DFH-WTL, 2006 U.S. Dist. LEXIS 26142, at *16 (S.D. Ind. Mar. 14, 2006) (citing *Epperly v. Johnson*, 734 N.E.2d 1066, 1076 (Ind. Ct. App. 2000)). This general rule is set aside only in limited instances where there were "special circumstances" present, like a "confidential relationship" such that "[t]he party reposing the confidence [is] in a position of inequality, dependence, weakness, or lack of knowledge, and the dominant party . . . abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage." *Sri Shirdi Saibaba Sansthan of Tristate, Inc. v. Farmers State Bank of Alto Pass*, Ill., 194 N.E.3d 55, 62 (Ind. Ct. App. 2022). That is not the case here. The terms of the DSSA and the threadbare allegations of the Amended Complaint preclude as a matter of law imposing fiduciary duties upon NNA. *See Richard I. Spiece Sales Co. v. Levi Strauss N. Am.*, 19 N.E.3d 345, 356 (Ind. Ct. App. 2014) (affirming trial court conclusion that no fiduciary duty was created where "[t]he parties' relationship consisted of a series of arm[']s length commercial purchase transactions between a buyer and seller").

That Indiana law characterizes the relationship between NNA and

Coyle as a franchisor-franchisee relationship[10] does not change the analysis,

as courts overwhelmingly recognize that the general franchisor-franchisee

relationship does not itself impose fiduciary duties. *See Original Great Am.*

*Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273,

280 (7th Cir. 1992) ("parties to a contract are not each other's fiduciaries, . . .

even if the contract is a franchise") (citations omitted)); *Broussard v. Meineke*

*Disc. Muffler Shops*, 155 F.3d 331, 348 (4th Cir. 1998) ("A fiduciary bears the

extraordinary obligation . . . never [to] place his personal interest over that of

the persons for whom he is obliged to act. The near-universal rejection of

imposing fiduciary duties in the franchise setting reflects a recognition that

these obligations are out of place in a relationship involving two business

entities pursuing their own business interests, which of course do not always

coincide").[11] Indeed, courts reject the notion that franchisees are "helpless

---

[10] Indiana state law defines "franchise" to require that the franchisee pay a "Franchise Fee" to the franchisor "for the right to conduct a business to sell, resell, or distribute goods, services, or franchises under a contract agreement." Ind. Code § 23-2-2.5-1. Although no Franchise Fee is required between automobile manufacturers and dealers in general (or between NNA and Coyle specifically), the automobile manufacturer-dealer relationship is nevertheless called a franchise relationship under Indiana law. Ind. Code § 23-2-2.7-5.

[11] *See also, e.g.*, *FLB, LLC v. Cellco P'ship*, 536 F. App'x 132, 134 (2d Cir. 2013) ("it is settled that no fiduciary relationship exists between a franchisor and franchisee"); *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 726 (5th Cir. 1997) (noting the lack of case law finding a "fiduciary obligation in the

Davids to the franchisor's Goliath, [because] size, as that story teaches, is not a reliable indicator of strength or influence." *Broussard*, 155 F.3d at 348. As is the case here, franchisees are often "independent, sophisticated, . . . small, businessmen who dealt with [the franchisor] at arms' length and pursue[] their own business interests." *Id.* Indeed, another court dismissed a fiduciary duty claim against NNA based on a similar dealer-dealership franchise agreement. *Bedford Nissan, Inc. v. Nissan N. Am., Inc.*, No. 1:16 CV 423, 2016 U.S. Dist. LEXIS 149762, at *30-34 (N.D. Ohio Oct. 28, 2016). Despite being cited and relied on by both NNA and the district court, *e.g.*, AA at 19-21, Appellant failed to discuss or refute *Bedford* on appeal.

## C. The relevant contractual terms and pleading allegations provide no basis to impose a fiduciary duty on NNA

The DSSA's terms undermine any notion that Coyle was in a one-sided relationship of "inequality, dependence, weakness, or lack of knowledge." *Sri Shirdi*, 194 N.E.3d at 62. Appellant cites the DSSA's provisions regarding NNA's obligations to Coyle, App. Br. 20, but ignores the many other provisions of the same contract showing Coyle's obligations to NNA and that

---

context of a franchisor-franchisee, manufacturer-distributor relationship, or other transactional setting involving experienced managers"); *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1095 (N.D. Cal. 2017) ("The obligation to put the interests of the other party first is why a fiduciary relationship generally does not arise out of ordinary arms-length business dealings. In a typical business contract or relationship, one party does not commit to act in the other party's best interest rather than in its own.").

NNA was reciprocally relying on Coyle. The DSSA was explicitly modeled as a "personal services agreement," recognizing Coyle's expertise as a dealer, creating mutual obligations owed between the parties, and contemplating that disputes and divergent motives may arise between the parties. ASA at 1, 22-30. The parties here were not in a one-sided relationship, as NNA expressly entered into the DSSA in reliance on Coyle's "personal qualifications, expertise, reputation, integrity, experience, ability." *Id.* at 1.[12] Indeed, NNA was entirely reliant on Coyle to sell its vehicles, as manufacturers are prohibited by law from selling vehicles at retail, and may only sell their vehicles to their Indiana dealers (except in limited circumstances not applicable here).[13]

Further, while the Amended Complaint alleged (without support or citations) that "Automotive Franchise Agreements have been determined by the courts to be contracts of adhesion," ECF 46 ¶ 50, the DSSA, as relevant to

---

[12] *See also e.g.*, *id.* at 17 ("Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail . . . of Nissan Vehicles to customers located within Dealer's Primary Market Area."), 18 ("Dealer shall develop and maintain a quality service organization and shall render at the Dealership Facilities prompt, efficient, and courteous service to owners and users of Nissan Products . . .").

[13] *See* Ind. Code § 9-32-11-20 ("a manufacturer or distributor may not sell or offer to sell, directly or indirectly, a new motor vehicle to the general public in Indiana except through a new motor vehicle dealer holding a franchise for the line make covering the new motor vehicle.").

this dispute, was not a boilerplate standard contract of adhesion as Coyle claims. Instead, the provisions governing Coyle's "temporary" operation out of a trailer and the search for and selection of a permanent dealership site—the very terms giving rise to this lawsuit—were unique to Coyle's contract, rather than being part of the general Nissan dealership agreement terms. ASA at 9. The parties continued to negotiate and modify these provisions in the years following the initial execution of the DSSA. *E.g.* ASA at 31-35

The Amended Complaint's allegation that NNA's "right to approve the land and site gave rise to a special relationship of trust and confidence," ECF 46 ¶ 53, finds no support in case law. NNA's discretion in approving the permanent site was governed by the DSSA, which identified the requirements for a permanent site. As the district court recognized, "NNA's contractual authority to approve Coyle's site selection does not create a special trust and confidence to support a fiduciary relationship." AA at 22. *See also Broussard*, 155 F.3d at 345-46 (criticizing district court for allowing "a straightforward contract dispute . . . to become a massive tort action" through imposing fiduciary duties on franchisor).[14]

_____

[14] Any expectation of extra-contractual fiduciary duties is also foreclosed by the DSSA's "Entire Agreement" clause, wherein the parties agreed the there were no "promises, warranties, covenants or undertakings between the parties other than those expressly set forth in this Agreement." ECF 46-1 at 49. *See Broussard*, 155 F.3d at 347 (recognizing that general rule against

**D. Indiana's comprehensive statutory scheme governing vehicle manufacturers and dealers further negates the judicial imposition of fiduciary duties on NNA**

Coyle did not even attempt to identify a statutory source for its assertion that NNA owed it fiduciary duties. ECF 46 ¶¶ 49-59. Nor could it. In fact, Indiana's comprehensive legislative scheme governing vehicle manufacturers and dealers undermines Appellant's request for this court to impose such a duty here.

Indiana's legislature passed various laws to govern every aspect of manufacturer-dealer relationship that it has determined could result in unfairness or abuse. *E.g.*, Ind. Code. §§ 9-32-11 et seq., 9-32-13 et seq. When evaluating other states' similar legislative schemes, courts declined to judicially impose fiduciary duties. *See Broussard*, 155 F.3d at 349 ("Without a clearer signal from the North Carolina courts -- or from the North Carolina legislature -- that they are willing to break with the great majority of other jurisdictions and lower the threshold for imposing fiduciary obligations, we are unwilling to do so ourselves on their behalf."); *Bedford Nissan*, 2016 U.S. Dist. LEXIS 149762, at *33-34 (granting motion to dismiss and noting that "the Court is not aware of any provisions in [Ohio or federal law] that create a fiduciary relationship.").

---

fiduciary duties between contracting parties is "particularly applicable" in the context of an integration clause).

To the extent protections are required for automobile dealers like Coyle, the Indiana legislature has passed laws accordingly.

### E. Appellant's reliance on irrelevant allegations and inapposite case law fails to justify imposing a fiduciary duty on NNA

Appellant failed to identify any cases applying Indiana law finding fiduciary duty in an analogous context (franchise or otherwise), instead citing cases where courts sided with the defendant and found no fiduciary duty existed, *e.g.*, *Sri Shirdi*, 194 N.E.3d at 62, and/or cases involving distinct factual contexts. *E.g.*, *Kapoor v. Dybwad*, 49 N.E.3d 108, 129-30 (Ind. Ct. App. 2015) (fiduciary duty owed by trusted financial advisors to clients). Appellant fails to discuss, let alone refute, the Indiana cases the district court cited and relied on in dismissing the fiduciary claim, AA at 19-20 (discussing *Ray Skillman Oldsmobile* and *Richard I. Spiece*).

Nor do Appellant's non-Indiana cases salvage its breach of fiduciary duty claim. Such cases, more than a decade old and interpreting and applying other states' laws,[15] offer no help in predicting how the Indiana Supreme Court would decide the issue today. *See Doemer*, 847 F.3d at 527. To the extent such cases are even relevant, they are readily distinguishable. One, for

---

[15] *E.g.*, *Walker v. U-Haul Co.*, 734 F.2d 1068, 1075 n.29 (5th Cir. 1984) (stating court was bound by circuit precedent despite contrary authority "unless the Mississippi Supreme Court repudiates its interpretation of Mississippi law, or unless the court sitting en banc overrules it")

example, denied the motion to dismiss based solely on the pleadings because, unlike here, the franchise agreement itself was not part of the pleading record. *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, No. 3:09 CV 792, 2010 U.S. Dist. LEXIS 66732, at *7-11 (N.D. Ohio July 2, 2010).[16] Further, the cases support the conclusion that the typical franchisor-franchisee relationship does not create a fiduciary duty absent "exceptional circumstances." *E.g.*, *Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc.,* No. 13-cv-11213, 2014 U.S. Dist. LEXIS 35909 (D. Mass. Mar. 18, 2014).[17] One of the cases noted that a franchisor's control over "central facets" of the franchise and requirements that the franchisee follow "specific programs and procedures" set by franchisor "likely would not give rise to fiduciary duties." *Towne v. Robbins*, 339 F. Supp. 2d 1105, 1112 (D. Or. 2004). The single appellate court case where the court adopted a broader standard for a franchisor's duties to franchisees, *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979), is in direct conflict with this Circuit's precedent.

---

[16] After reviewing the franchise agreement's terms on summary judgment, both the district court and Sixth Circuit agreed that contract's terms requiring the dealer to "report sensitive information to Ford, such as the dealership's balance sheet, profitability, and other operations information" did not create fiduciary duties. *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 530 F. App'x 542, 548 (6th Cir. 2013);

[17] *See also, e.g.*, *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 219-20 (S.D.N.Y. 2007).

*See Original Great Am. Chocolate Chip Cookie Co., Inc.*, 970 F.2d 273 at 280. Further, that decision has been criticized as "dubious authority" for taking a "distinct minority approach." *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1183 (D. Kan. 1990). *See also Amoco Oil Co. v. Cardinal Oil Co.*, 535 F. Supp. 661, 666 (E.D. Wis. 1982) (rejecting *Arnott* and concluding franchisee failed to state a claim for breach of fiduciary duty).

Appellant attempts to conjure a fiduciary relationship out of separate DSSA provisions governing Coyle's sharing of various financial reports to NNA that would be treated as confidential. App. Br. 23 (citing ECF 46-1 at 2, 30, 31). As an initial matter, such allegations are irrelevant to the breach of fiduciary duty claim as pled, which alleged fiduciary duties rooted solely in NNA's discretion in selecting the permanent dealership location. ECF 46 ¶¶ 49-59. Further, the argument fail on the merits, as it would impose fiduciary duties on the vast majority of modern commercial relationships, frequently incorporating confidentiality agreements or provisions (as here) allowing the parties to transmit required confidential information. Indeed, the case law is clear that the sharing of confidential information alone does not serve as an "exceptional circumstance" necessary to give rise to a fiduciary relationship.[18]

---

[18] *See, e.g.*, *Rindlisbacher v. Steinway & Sons Inc.*, 497 F. Supp. 3d 479, 507 (D. Ariz. 2020) (rejecting argument that fiduciary relationship arose because dealer "entrusted [manufacturer] with confidential information"); *Strawflower Elecs., Inc. v. Radioshack Corp.*, No. C-05-0747 MMC, 2005 U.S.

Appellant fails to identify a single decision of *any* appellate court in the nation holding that an automobile manufacturer owes a fiduciary duty to its dealers. And Appellant offers no compelling reasons why this Court should be the first. Instead, the sparse collection of old cases from other jurisdictions Appellant cites actually support NNA's and the district court's conclusion that there was no fiduciary duty owed from NNA to Coyle as a matter of law. This Court should affirm the dismissal of Coyle's breach of fiduciary duty claim.

## II. The District Court Properly Granted Summary Judgment Against Coyle's Contractual and Statutory Claims

### A. Standard of Review

The district court's grant of summary judgment is reviewed *de novo*, construing all facts in the light most favorable to the non-moving party. *See Trade Fin. Ptnrs, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009). Summary judgment is appropriate when the record demonstrates "there is no genuine issue as to any material fact." *Id.* (quoting Fed. R. Civ. P. 56(c)). The moving party may meet its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the

---

Dist. LEXIS 45205, at *12-15 (N.D. Cal. Sept. 20, 2005) (dismissing fiduciary duty claim based on allegation required sharing of confidential "customer information, sales information, and marketing information"); *RPM, Inc. v. Oatey Co.*, 2005-Ohio-1280, ¶ 24 (Ohio Ct. App. Mar. 23, 2005) (same for "confidential financial information").

nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

In order to avoid summary judgment, Coyle was required to "present something more than a mere scintilla of evidence, or some metaphysical doubt as to the material facts." *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (internal citations and quotations omitted). Further, Coyle had to "point to specific facts showing that there is a genuine issue for trial[, as] inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Ptnrs,* 573 F.3d at 407. "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question, then the court must enter summary judgment against [it]." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## B. There was no genuine issue of material fact on Coyle's contract claims (Counts I & III)

A breach of contract claim requires proof of "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).[19] "The

---

[19] As Coyle concedes, App. Br. 7, California law applies to the contract claims pursuant to the DSSA's choice of law provision. ASA at 29.

covenant of good faith and fair dealing, implied by [California] law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110 (Cal. 2000). The implied covenant does not "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.*

Summary judgment was required here because the undisputed record evidence demonstrated that NNA's actions at all times complied with the terms of the DSSA and its good faith duties. Although Appellant's Brief attempts to raise a variety of supposed breaches (which fail for reasons discussed below), the operative pleading focused exclusively on NNA's initial refusal, then ultimate acquiescence to, of the Broadway Site as a permanent location. ECF 46 ¶¶ 29, 47-48. In its summary judgment briefing, in less than a page of argument, Coyle merely claimed that there were issues of fact as to whether NNA breached its contractual duties by allegedly "conceal[ing]" market study reports about the location of a permanent dealership and by its rejection of proposed locations that allegedly met certain requirements. ECF 127 at 24. Beyond those allegations, Coyle declined to "hash out all that has been said before" merely asserted that its evidence was "more than enough to create material issues of fact." *Id.* Such cursory assertions waived any

challenge to the summary judgment against Coyle's contract claims because "legal contentions . . . must be presented before the district judge acts, rather than as afterthoughts." *Builders Nab LLC v. FDIC*, 922 F.3d 775, 778 (7th Cir. 2019). *See also Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) ("a case must be fully fleshed out at the district court level before an appellate court can accurately review that case").

Even if Coyle's threadbare pleading and briefing had presented all issues raised in Appellant's Brief, they fail on the merits as the district court properly determined that there was no breach of NNA's contractual duties as a matter of law. AA at 44-49. None of NNA's actions, whether those alleged in the Amended Complaint, cursorily noted on summary judgment, or belatedly raised on appeal, violated the terms of the DSSA.

1. *Both of the contract claims required Coyle to demonstrate evidence of NNA's bad faith in exercising its discretion under the DSSA*

The DSSA gave NNA broad, but not unbounded, discretion in deciding whether to approve sites. The enumerated factors guiding NNA's discretion included that a site: be "reasonably equivalent" to NNA's "principal competitors in the geographic area;" be sufficient to accommodate an "exclusive, separate and distinct (stand-alone)" facility; comply with NREDI criteria; and align with "the sales opportunities and service requirements of the Primary Market Area." ASA at 9, 16. The factors governing NNA's

discretion represent a contractual "satisfaction clause" enforceable under California law. *Mattei v. Hopper*, 330 P.2d 625, 626 (Cal. 1958). Where, as here, the relevant factors "are too numerous and varied to permit the application of a reasonable [person] standard," and satisfaction under the contract involves NNA's "judgment," Coyle's breach of contract claim related to NNA's discretion over the permanent location is evaluated under a "good faith" standard. *Id.* at 627. *See also Eventbrite, Inc. v. Concerts Ltd.*, No. 20-cv-04040-SI, 2022 U.S. Dist. LEXIS 77438, at *4 (N.D. Cal. Apr. 28, 2022) (applying good faith standard where "the factors and considerations determining whether or not a [material adverse change] has occurred are myriad, seemingly endless, and are left to [defendant's] discretion.")[20]

As noted above, Coyle cannot rely on the implied covenant of good faith and fair dealing to "impose substantive duties . . . beyond those incorporated in the specific terms of the[] agreement." *Guz,* 8 P.3d at 1110. Accordingly, Coyle was required to adduce evidence that NNA's actions constituted bad faith. Coyle failed to make that showing.

---

[20] Even if a reasonableness standard applied, *Mattei*, 330 P.2d at 626-27, NNA complied with this as a matter of law. Coyle failed, for all of the reasons presented here, to create a genuine issue of material fact on whether NNA's decisions were "arbitrary, capricious, or lacking in evidentiary support." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr. 2d 267, 279 (Cal. Ct. App. 2002). Indeed, Coyle failed to even argue, let alone demonstrate, that the proposed sites that NNA rejected met the "reasonably equivalent" requirement. *See generally* ECF 127; App. Br.

2. *NNA's review and ultimate approval of Coyle's proposed sites complied with the DSSA's terms and did not constitute bad faith*

The undisputed record demonstrates that NNA's actions in reviewing Coyle's proposed sites were all permissible exercises of the discretion afforded to NNA to ensure a permanent site met the characteristics set forth in the DSSA.

There was no evidence in the record that NNA's denial of the Broadway Site prior to 2017 was made in bad faith or was in any way unreasonable. The record evidence instead showed the opposite: NNA consistently explaining to Coyle why the Broadway Site was unsatisfactory due to visibility and accessibility that were not "reasonably equivalent" to NNA's principle competitors like Honda and Toyota, s*ee, e.g.*, ECF 140-6 at 2, a point never disputed by Coyle and not even addressed in Appellant's Brief. The evidence further showed Coyle was fully aware of this fact. *See, e.g.*, ECF 46-2 at 2 (Coyle's AEG Report rating Broadway Site lowest on "visibility"); ECF 140-1 at 19:19-20:15 (Michael Coyle agreeing Nissan's competitors had dealerships with access and visibility to main roads). Indeed, NNA first notified Coyle of the Broadway Site's shortcomings even before the parties signed the DSSA. ECF 109 ¶ 4. Further, when Coyle presented NNA with the AEG Report recommending the Broadway Site over two other locations, NNA reviewed the report and considered the findings, before disagreeing with its

conclusions. ECF 140-6 at 2-3. As NNA explained to Coyle in a December 2014 letter, the AEG Report "relie[d] on arbitrary weighted opinions of three potential locations," leading NNA to instead rely on its "own in-market microsite observations and professional experience" to weigh the "many variables involved." *Id.* NNA was under no obligation to blindly accept the conclusions of Coyle's AEG Report.

Similarly, there is no evidence that NNA's refusal to approve the Jeff Towne Center Site was made in bad faith, because it was undisputed that site was located next to an adult bookstore and in a then-undeveloped area. ECF Nos. 126-3 at 1-2; 140-1 at 69:7-70:19. Nor did Coyle present evidence that that the location was "reasonably equivalent" to NNA's competitors as required by DSSA.

Coyle's arguments related to NNA's expressed geographic preferences and any changes to those preferences over the five years of searching, also fail to demonstrate bad faith. Appellant claims NNA "demand[ed] that Coyle acquire a site within its preferred geographic boundaries," App. Br. 3, or "dictat[e] the precise location" of the permanent dealership. *Id.* 26. Such allegations are not supported, and, in fact are directly contradicted, by the record evidence. NNA approved sites—proposed by Coyle—in *multiple* locations, sites which Coyle alone subsequently refused to acquire. *Supra* 11. In fact, one of these sites was outside of the two "preferred locations" NNA

offered as guidance in its December 2014 letter to Coyle, demonstrating that NNA was not "dictating a precise location" over and above the multiple other factors it used to evaluate a satisfactory site. *Compare* ECF 140-1 at 124:5-127:6 (discussing NNA willingness to approve 950 Lewis & Clark Parkway site west of I-65), *with* ECF 140-6 at 5 (map of two "preferred locations" noted by NNA). Nor do the alleged shifts in geographic preferences over five years demonstrate a violation of the DSSA or bad faith, as Coyle cited no aspect of the DSSA, whether explicit or implied, which required NNA to maintain static geographic preferences in the light of years of shifting economic conditions, municipal developments, and competitors' actions.

Similarly, NNA's 2017 decision to approve the mediocre Broadway Site after previously declining it was made in the context of that half-decade search and Coyle's ongoing use of a trailer to sell Nissan vehicles. ECF 110 ¶ 3-4. That evidence and context was uncontradicted. Appellant attempts to retroactively penalize NNA for its compromise, offering a summary allegation that this later approval "indicates that the Broadway Site had always been approvable." App. Br. 30. But the DSSA required a location and facility "reasonably equivalent" to that of NNA's competitors, in addition to the DSSA's other requirements. ASA at 9, 16. Coyle presented no evidence that the Broadway Site met the "reasonably equivalent" requirement. That NNA ultimately decided to accept a mediocre site not equivalent to its competitors,

all in order to end the years of Coyle's delay, does not change the undisputed fact that the Broadway Site did not meet the contractual requirements.

Appellant also faults NNA for declining to approve proposed sites that Coyle claimed could accommodate an NREDI-compliant facility.[21] This argument highlights a central and fatal flaw in Appellant's Brief: The DSSA contains no obligation for NNA to approve any particular location simply because it could accommodate an NREDI facility. *See generally* ECF 46-1. While the DSSA required Coyle to construct a facility meeting the "size, appearance and layout" of the NREDI guidelines, ASA at 9, it *also* required that the location and facilities must be "reasonably equivalent to those maintained by Dealer's principal [] competitors in the geographic area in which Dealer's Primary Market Area is located." *Id.* at 16. Appellant's briefing completely ignores this latter requirement, failing even to mention it. And yet it was undisputed that the Broadway Site and the other locations rejected by NNA did not provide a location reasonably equivalent to NNA's principal competitors in the area, all of which had access and visibility from major thoroughfares, ECF 140-1 at 19:19-20:15; ECF 140-6 at 2, and none of

---

[21] *E.g.*, App. Br. 25-26 ("NNA's repeated rejection of Coyle's proposed sites had nothing to do with whether those sites could accommodate an adequate, NREDI-compliant facility"); *id.* at 29 ("Coyle designated evidence that the [sites] were all sufficient to . . . meet NNA's NREDI compliance approval").

which were next to adult bookstores in undeveloped areas. ECF 140-1 at 69:7-70:19.

Finally, there was zero evidence that NNA harbored an ulterior motive or sought to harm Coyle or deprive it of the benefit of the bargain. Both parties acknowledged that Coyle's temporary site and facilities were completely inadequate and unacceptable, ASA at 8-9, a fact NNA emphasized when it capitulated to Coyle's demands for the Broadway Site after years of searching for an acceptable site. ASA at 31-34. Indeed, NNA had no motive to delay, as it was statutorily reliant on Coyle to sell its vehicles. *See* Ind. Code § 9-32-11-20. And Coyle also specifically admitted, in Amendment 2, that its failure to comply with the DSSA's site and facilities requirements afforded NNA the right to require Coyle to sell off its dealership, a right NNA agreed to forego in exchange for Coyle's agreement to meet new deadlines. ASA at 31-34.

In exercising its discretion in approving a permanent dealership location, NNA fully complied with the terms of the DSSA. There simply was no evidence that NNA exceeded its discretion or exercised its contractual rights in bad faith in order to deprive Coyle of the benefit of the contract.

3. *Appellant's other allegations also fail to demonstrate any breach of the DSSA or bad faith by NNA*

Coyle's various other allegations fall short of showing any violation of the DSSA or bad faith.

Coyle faults NNA for an alleged failure to tell Coyle that two of the sites it proposed were within a "preferred area" defined by a 2010 marketing study. App. Br. 30. Yet Coyle does not (and cannot) claim that NNA was contractually obligated to list the characteristics that a site may have met, particularly when it is undisputed that the sites failed to meet various other necessary requirements. Nor was it bad faith for NNA to fail to share the entire, rather than summary, versions of NNA's internal 2010 or 2014 marketing studies with Coyle. As Coyle admitted, there was no provision in the DSSA requiring that such reports be shared. App. Br. 30; AA at 47-48. Coyle further admits that the full report contained no additional relevant information beyond the summary that NNA undisputedly *did* share with Coyle. ECF 140-1 at 104:6-14, 108:4-12.

Coyle's allegation related to NNA's "constant turnover in personnel," App. Br. 29, was not argued to the district court. *See generally* ECF 127. Accordingly, it is not properly before this Court on appeal. *See Builders Nab*, 922 F.3d at 778. It also fails on the merits, as there are no provisions of the DSSA requiring a single point of contact with Coyle. Nor is there any

evidence (or allegation) that any change in personnel was made in a bad faith effort to prevent Coyle from receiving the benefits of the DSSA. Finally, the passing reference to "sales incentives" allegedly related to a permanent dealership location, App. Br. 20, 28, were unsupported by any evidence identifying the specific incentives allegedly withheld.

Even if good faith and reasonableness *may* in some cases be questions of fact, there is no violation of the implied duty of good faith and fair dealing as a matter of law when the conduct alleged was "expressly permitted by the [contract] and was clearly within the parties' reasonable expectations." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal, Inc.*, 826 P.2d 710, 729 (Cal. 1992). Indeed, it is undisputed that Coyle knew before it even entered the DSSA that NNA found the Broadway Site unacceptable, so Coyle had no reasonable expectation that NNA would later approve it. The district court did not "invade[] the province of the jury" as Appellant claims. App. Br. 31. Because Appellant failed to adduce any evidence sufficient to create a genuine issue of material fact, the court properly granted summary judgment. *Trade Fin. Ptnrs*, 573 F.3d at 407.

## C. There was no genuine issue of material fact on Coyle's IDFPA and ADDCA claims (Counts V and X)

Count V of Coyle's Amended Complaint claimed NNA violated the Indiana Deceptive Franchise Practices Act ("IDFPA"). As relevant here, the IDFPA states:

> "It is unlawful for any franchisor . . . to . . . [c]oerc[e] [a] franchisee to . . . [e]nter into any agreement with the franchisor or any designee of the franchisor, or do any other act prejudicial to the franchisee, by threatening to cancel or fail to renew any agreement between the franchisee and the franchisor. *Notice in good faith to any franchisee of the franchisee's violation of the terms or provisions of a franchise or agreement does not constitute a violation of this subdivision.*

Ind. Code § 23-2-2.7-2(1)(iv) (emphasis added).

Count X alleges a violation of the Automobile Dealers Day in Court Act ("ADDCA"), which creates a cause of action for "damages [a dealer] sustained . . . by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise [agreement], or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

The ADDCA defines good faith as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, that recommendation, endorsement, exposition,

persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e). This "good faith" definition "has been construed by the courts according to its literal language, and the existence or nonexistence of 'good faith' must be determined *in a context of actual or threatened coercion or intimidation*." *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608, 610 (7th Cir.) (emphasis added), *cert. denied,* 409 U.S. 981 (1972). Accordingly, the ADDCA "does not provide a new remedy for breach of contract but creates a new cause of action, an indispensable element of which is not the lack of good faith in the ordinary sense but a lack of good faith in which coercion, intimidation, or threats thereof, are at least implicit." *Id.*[22]

Case law applying Indiana Code § 23-2-2.7-2(1)(iv) in general or its "good faith" standard in particular, is limited. However, courts applying Indiana law have analogized the IDFPA to the ADDCA. *See, e.g.*, *Elder Care*

_____

[22] *See also, e.g.*, *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 42-46 (1st Cir. 2004); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1378-79 (10th Cir. 1988); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 95-97 (2d Cir. 1987); *R.D. Imports Ryno Indus., Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222, 1227 (5th Cir.), *cert. denied*, 484 U.S. 818 (1987); *American Motors Sales Corp. v. Runke*, 708 F.2d 202, 207 (6th Cir. 1983); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. denied*, 436 U.S. 946 (1978); *Francis Chevrolet Co. v. General Motors Corp.*, 602 F.2d 227, 229 (8th Cir. 1979); *Rea v. Ford Motor Co.*, 497 F.2d 577, 585 (3d Cir.), *cert. denied*, 419 U.S. 868 (1974)

*Providers of Ind., Inc. v. Home Instead, Inc.*, No. 1:14-cv-01894-SEB-MJD,

2017 U.S. Dist. LEXIS 42792, at *66 (S.D. Ind. Mar. 24, 2017) (granting

summary judgment on IDFPA claim after citing to cases applying ADDCA);

*Ford Motor Credit Co. v. Garner*, 688 F. Supp. 435, 444-45 (N.D. Ind. 1988)

(relying on cases analyzing ADDCA to define "dealer" under IDFPA).[23]

Accordingly, although two statutes impose independent legal requirements,

the same lack of evidence of bad faith coercion (or indeed, of any bad faith)

justified summary judgment on both counts.

    1.    *None of NNA's interactions or communications with Coyle constituted bad faith or coercive threats in violation of the IDFPA or ADDCA*

The district court concluded that there was no IDFPA violation as a

matter of law because "NNA was entitled under the DSSA to terminate the

contract if Coyle did not meet its obligations, and NNA's 'threats' simply were

communications demanding compliance with the contractual obligations of

the parties." AA at 52. The court then granted summary judgment for NNA

---

[23] Appellant instead attempts to analogize the IDFPA to insurer bad faith cases. App. Br. 32-33. Yet Indiana courts have described insurer-insuree disputes as a "unique" and "*sui generis*" context. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518-19 (Ind. 1993). Even if analogous, NNA's actions here fall well short of the standard applied in insurer bad faith cases, which "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998) (granting summary judgment to insurer for lack of genuine issue of material fact of bad faith).

on the ADDCA claim "[f]or the same reasons discussed in the sections above" and because "[t]he evidence indicates that NNA did not fail to act in good faith in performing or complying with the terms of the DSSA." *Id.* at 54-55. Those conclusions are fully supported by the undisputed evidence.

Under the explicit terms of the DSSA, Coyle agreed that any failure to "timely meet the facility obligations" for identifying and constructing a permanent location "shall constitute a material breach of this Agreement." ASA at 9-10. This "material breach" triggered the DSSA's divestiture provisions, requiring Coyle to "freely and voluntarily agree[] to sell all of its Nissan dealership assets or otherwise transfer its ownership interest in the Nissan dealership operations." *Id.* at 10. In the years after the DSSA was executed, Coyle violated these obligations repeatedly. *Supra* 8-12. In response, NNA did nothing more than communicate its ongoing desire for Coyle to fulfill its contractual duties, while also offering Coyle assistance, extensions and ultimately a compromise of NNA's rights to do so. *Supra* 8-12.

Case law makes clear that NNA's actions did not constitute bad faith as a matter of law. As demonstrated by the parties' various interactions in the summary judgment record, including letters from November 27, 2013 (ECF 46-4), December 15, 2014 (ECF 140-6), November 18, 2016 (ECF 126-2 at 76-80) and other communications (ECF 126-2 at 9-10, 13), NNA displayed no bad faith. Instead, NNA repeatedly reminded Coyle of the specific contractual

terms it agreed would constitute a "material breach" if unfulfilled, and notified Coyle that NNA would exercise its rights if Coyle failed to cure the defects. Indeed, Coyle agreed in Amendment 2 that NNA was foregoing its rights to require divestment in extending the contract deadlines yet again. ASA at 31-34. Such conduct is not evidence of bad faith. *See Ed Houser Enters., Inc. v. Gen. Motors Corp.*, 595 F.2d 366, 370 (7th Cir. 1978) ("nonrenewal of a franchise for failure of the dealer to meet the bargained for renewal condition has been held to be non-coercive conduct" under the ADDCA); *Gen. Motors Corp. v. Mac Co.*, 247 F. Supp. 723, 726 (D. Colo. 1965) (granting summary judgment on ADDCA claim after recognizing that "hard bargaining does not of itself subject a manufacturer to liability [because] a manufacturer is not prohibited from enforcing just and reasonable contract provisions even though the same appear burdensome to dealers"); *Berry Bros. Buick, Inc. v. Gen. Motors Corp. (Buick Motor Division),* 257 F. Supp. 542, 547 (E.D. Pa. 1966) (even manufacturer "indifference" to a dealer is not "bad faith" within ADDCA).[24]

---

[24] Coyle tries to draw a distinction between a "notice of a breach," and a "threat to cancel or fail to renew a franchise." App. Br. 34. Yet Coyle cites no case law to support or justify its arbitrary distinction between notifying a party it is in breach and notifying a party of the consequences (whether cancellation, nonrenewal or other) of that breach. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 807 (7th Cir. 2020) ("Proof of [claims and defenses] in the air, so to speak, will not do." (citation omitted)); *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 439 (7th Cir. 2012) ("When there are

Coyle's claim that NNA's rejection of proposed dealership sites constitutes bad faith under the ADDCA and IDFPA fails because that action had nothing to do with prohibited "coercion" under those statutes. And, in any event, it is undisputed that, under the DSSA, NNA could take a variety of factors into account when exercising its discretion over the permanent site selection, including the right to require that the site be in a location with accessibility and visibility "reasonably equivalent" to its competitors. ASA at 16. As courts have recognized, "an automobile manufacturer is not precluded by the [ADDCA] from requiring its dealers, pursuant to the contract between them, to provide facilities commensurate with the good will attached to the trade name of the manufacturer, and adequate to compete with dealers in products of the manufacturer's competitors." *Ed Houser*, 595 F.2d at 370.

Similarly, none of Appellant's laundry list of criticisms, App. Br. 34-35, 37, constitute the coercive behavior prohibited the IDFPA or ADDCA; and all fall well short of demonstrating bad faith for reasons explained above. While NNA communicated its geographical preferences (amidst changing economic development conditions in the area) over the years, it did not attempt to enforce a specific geographic location, but instead properly evaluated (and

---

authorities to cite for a key proposition, the party asserting the proposition must cite them . . . and the failure to do so forfeits reliance on the proposition.").

offered approval) for sites in multiple locations based on their visibility, accessibility, and other factors. *Supra* 8-12. Further, a site's ability to support NREDI facilities was necessary, but not sufficient to warrant NNA approval. *Supra* 5-7.

Because the "undisputed evidence makes clear that [NNA's] conduct . . . adds up to nothing more than the reasonable exercise and enforcement of its legal rights under the [DSSA]," summary judgment was appropriate. *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 247 (S.D.N.Y. 2002) (ADDCA claim).

2.  *Both the IDFPA and ADDCA claims independently fail because Coyle was not prejudiced or damaged by NNA's actions*

In addition to the lack of evidence of any unlawful threats, Coyle failed to demonstrate it was harmed by the alleged violations of the statutes, independently justifying summary judgment on both claims. Both the IDFPA and ADDCA require that a plaintiff demonstrate it was harmed by the alleged statutory violations. *See* Ind. Code § 23-2-2.7-2(1)(iv) ("It is unlawful for any franchisor . . . [to] do any other act prejudicial to the franchisee); 15 U.S.C. § 1222 (providing cause of action for "damages" from an ADDCA violation). As NNA argued at summary judgment, there was no evidence that

Coyle was "prejudiced" or "damaged" by any alleged threats from NNA. ECF

108 at 10-14; ECF 139 at 7.[25]

The summary judgment record contained no allegations or evidence

that any alleged threats caused Coyle to cease operations as a Nissan

dealer.[26] *See* AA at 55 ("the DSSA was never terminated, canceled, or not

renewed"). Nor were there allegations or evidence that any alleged threats

affected the final location of the approved site for permanent Nissan

facilities—indeed, Coyle ended up in the same Broadway Site it initially

proposed. NNA's refusal to approve the substandard site before 2017 was not

a "threat[] to cancel or fail[ure] to renew [the franchise agreement" under the

IDFPA, Ind. Code § 23-2-2.7-2(1)(iv), or act of "coercion" under the ADDCA.

15 U.S.C. § 1222. Damages alleged from NNA's supposed "delay" in

approving the Broadway Site are not related to any "threats" of termination.

Coyle's failure to show or even allege that it suffered any damages from

---

[25] Although the district court did not directly justify summary judgment on
the lack of evidence of prejudice or damages caused by the allegedly unlawful
actions, this Court "may affirm on any ground supported in the record, 'so
long as that ground was adequately addressed in the district court and the
nonmoving party had an opportunity to contest the issue.'" *Peretz v. Sims*,
662 F.3d 478, 480 (7th Cir. 2011) (citation omitted). Such is the case here.

[26] NNA's subsequent notice of termination based on Coyle's improper use of
the approved Broadway Site for its Chevrolet-Buick-GMC dealership was not
at issue on summary judgment.

improper "coercion" independently justifying summary judgment in NNA's favor.

### III. The District Court Properly Granted the Rule 59(e) Motion to Correct an Error of Law on the Declaratory Judgment Counterclaim

#### A. Standard of Review

This Court "review[s] Rule 59(e) rulings for an abuse of discretion, although 'embedded legal questions are reviewed de novo.'" *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 669 (7th Cir. 2022) (citation omitted). "An appellant establishes an abuse of discretion only when 'no reasonable person could agree with the [decision of the district] court.'" *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 953 (7th Cir. 2013) (citation omitted).

A Rule 59(e) motion allows the court to "alter or amend a judgment," Fed. R. Civ. P. 59(e), upon a showing "(1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Cincinnati Life Ins.*, 722 F.3d at 954 (7th Cir. 2013) (citation and quotation marks omitted). "Rule 59(e) generally requires a lower threshold of proof than does Rule 60(b). . . . Instead of the exceptional circumstances required to prevail under Rule 60(b), Rule 59(e) requires that the moving party clearly establish a manifest error of law or an intervening change in the controlling law or present newly discovered evidence." *Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1121 n.3 (7th Cir. 2001).

**B. The district court did not abuse its discretion in concluding that it had erred when it initially granted Coyle's oral Rule 50 motion on the ground that NNA's declaratory judgment counterclaim was duplicative**

1. *NNA asserted a valid declaratory judgment counterclaim under 28 U.S.C. § 2201*

"In a case of actual controversy" in a court's jurisdiction, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.[27] NNA's counterclaim for declaratory judgment complied with these requirements.

NNA filed its declaratory judgment claim after learning that Coyle not only failed to start construction of the permanent Nissan dealership after the Broadway Site was approved in 2017, but instead had developed a portion of that same site as parking facilities for the Coyle family's entirely separate Chevrolet-Buick-GMC dealership. ECF 213 Counterclaim ¶¶ 20-27. NNA maintained that these actions rendered the Broadway Site unacceptable and

---

[27] The initial discretion afforded to the district court on whether to consider a declaratory judgment claim in the first place, *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714-15 (7th Cir. 2009), does not affect this Court's review of the parties' Rule 59(e) arguments. "A district court by definition abuses its discretion when it makes an error of law." *Koger v. Bryan*, 523 F.3d 789, 803 (7th Cir. 2008) (citation omitted). As noted by the district court, it awarded judgment as a matter of law "on the sole basis" of its agreement with Coyle's duplicative claim argument. AA at 77. As demonstrated to the district court, and discussed below, *infra* 54-58, the court's original "sole" legal conclusion was erroneous.

NNA sent a letter rescinding its prior approval in light of its understanding "that the Approved Site has been substantially modified for use by a competing line-make." *Id.* at ¶ 26. Coyle disagreed, claiming that the Broadway Site was still usable for NNA facilities (notwithstanding Coyle's failure to even start construction four years after approval), and instead filed supplemental pleadings based on NNA's rescission letter. *Id.* at ¶ 27. Accordingly, NNA sought a declaration that "Coyle's development of a significant portion of the [Broadway] Site, approved by NNA for a new Nissan facility, for the benefit of its Chevrolet dealership, constitutes a breach of the DSSA and Amendment No. 2." ECF 213 ¶¶ 34.

NNA's claim for declaratory judgment was entirely warranted because "there [wa]s a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, (1941); *see also Winamac Southern Ry. v. Toledo*, No. 3:09-CV-86, 2012 U.S. Dist. LEXIS 95015, at *7-8 (N.D. Ind. July 9, 2012) (holding declaratory judgment was warranted where both parties sought declaratory judgment regarding whether material breach of contract had occurred). No provision of the Declaratory Judgment Act requires that there be a showing of harm, which Coyle acknowledged in its post-trial briefing. ECF 343 at 3. Instead, Section 2201(a) explicitly states that declaratory relief is available "whether

or not further relief is or could be sought." This availability of prospective

relief prior to any alleged or actual harm distinguishes the Declaratory

Judgment Act, often used, as here, by parties as "a prelude to a request for

other relief, whether injunctive or monetary." *Berger v. Xerox Corp. Ret.*

*Income Guarantee Plan*, 338 F.3d 755, 763 (7th Cir. 2003).

2. *The district court improperly granted Coyle's last-minute motion for judgment as a matter of law on the declaratory judgment counterclaim*

At the close of evidence at trial, Coyle made an oral Rule 50 motion for

judgment as a matter of law, arguing for the first time that NNA's

counterclaims were duplicative. ECF 347 at 104-112. In response to that

motion, NNA argued that the claims were not duplicative because the

declaratory judgment claim did not require a showing of harm. *Id.* at 112-16,

120-22. NNA further pointed out that the declaratory judgment in its favor

would be directly applicable for any exercise by NNA of its termination and

divestiture rights under the DSSA and Indiana law should Coyle contest its

termination. *Id. See also* Ind. Code § 9-32-13-27 (prohibiting termination of a

franchise "without good cause"); § 23-2-2.7-1 (defining good cause to include

"any material violation of the franchise agreement"). After acknowledging the

proper purpose for which the declaratory judgment was sought, the court

ruled from the bench and stated that its order granting Coyle's Rule 50

motion was based on the assumption that NNA would be able to obtain

identical declaratory relief if the jury sided with NNA on Special Verdict Question No. 12 of the breach of contract counterclaim, which asked if Coyle breached the DSSA. ECF 347 at 127-29. *See* ECF 331 at 4

The jury did in fact rule for NNA on Question No. 12. ECF 331 at 4. However, Coyle subsequently used the jury's "no harm" finding on Special Verdict Question No. 13, *id.*, to argue post-trial that there was no finding of breach of the DSSA at all without damages, attempting to undermine the utility of the jury's finding in any state administrative proceedings if Coyle were to contest the termination permitted by the DSSA. ECF Nos. 335-336.

> 3. *NNA demonstrated that its declaratory judgment counterclaim was not duplicative and the district court properly granted Rule 59(e) relief to correct its legal error*

Provided the opportunity to formally brief this issue in its post-trial Rule 59(e) motion, NNA demonstrated that it was legal error to grant Coyle's oral judgment as a matter of law motion.

As quoted above, NNA's declaratory judgment action specifically did not seek a declaration that it was harmed. ECF 213 ¶ 34. Instead, it only sought a declaration that Coyle's actions breached the DSSA. *Id.* Even absent any showing or declaration of harm, such a declaration would be relevant to NNA's assertion of its contractual, administrative, and statutory remedies against Coyle. ASA at 33-34; Ind. Code § 9-32-13-27 and 31. Declaratory judgment in NNA's favor would, among other things, foreclose Coyle from

arguing in any state administrative proceedings that its continued use of the Broadway Site for its Chevrolet-Buick-GMC dealership was not a breach of the DSSA. Under principles of collateral estoppel,[28] NNA could directly apply the declaratory judgment to these future contractual and/or administrative remedies.

Appellant's Brief fails to address or refute the fact that neither the Declaratory Judgment Act in general, nor NNA's declaratory judgment counterclaim specifically sought or required a showing of harm. Instead, Appellant devotes significant space to arguments related to the damages requirements for a *breach of contract* claim under California law and whether NNA proved that element at trial. App. Br. 40-42. In focusing on an element that is undisputedly *not* required for a declaratory judgment counterclaim, Appellant effectively concedes that the claims are not duplicative, as the district court concluded when granting the Rule 59(e) motion.

In light of the "more robust explanation before it" provided through NNA's post-trial arguments and case law support, the court properly

---

[28] "Generally, collateral estoppel operates to bar a subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and the same <u>fact or issue</u> is presented in the subsequent lawsuit." *Midwest Minerals, Inc. v. Wilson*, 983 N.E.2d 1180, 1190 (Ind. Ct. App. 2013) (underline in original). "In that situation, the first adjudication will be held conclusive even if the second action is on a different claim." *Id.* (affirming application of collateral estoppel to prevent re-litigation of fact issues that had already been decided).

concluded "it was erroneous to enter judgment as a matter of law on the sole basis of duplicative claims." AA at 77.

Appellant attempts to argue that the district court "ignored," "set aside," or "nullified" the jury's finding of no harm on the breach of contract counterclaim. App. Br. 41, 43. [29] This claim is directly foreclosed by the district court's order. In the same order granting NNA's Rule 59(e) motion, the court also denied the parties' separate renewed Rule 50 motions for judgment as a matter of law. Specifically, the court declined to grant NNA's Rule 50 motion to delete the phrase "however the jury determined that Nissan North America was not harmed by Coyle's breach of contract," based on NNA's argument that the "no harm" finding was contrary to the weight of the evidence. AA at 72, 76. In doing so, the court stated it "will not speculate as to how the jury viewed this evidence, nor will the Court make credibility determinations or weigh the evidence on a Rule 50(b) motion" and that it was "appropriate to leave the jury verdict undisturbed." *Id.* at 76. NNA's Rule 59(e) motion in contrast, argued "it was legally erroneous to dispose of the claim on the basis that it was duplicative of the breach of contract claim." *Id.* at 77. As the district court noted, NNA argued that "*even if* there was no harm to support a breach of contract claim, declaratory judgment does not

_____

[29] Coyle does *not* argue that district court's declaratory judgment lacked a sufficient evidentiary basis. *Id.* Clearly, it was well supported by the record.

require harm, and, thus, it is not duplicative of a claim for breach of contract, which does require harm." AA at 73 (emphasis added). Thus, the district court's grant of the Rule 59(e) motion left undisturbed the jury's separate factual determination on the breach of contract counterclaim. [30]

As NNA successfully argued in its post-trial briefing, and as the district court recognized in granting the Rule 59(e) motion, declaratory judgment for NNA pursuant to 28 U.S.C. § 2201 was the proper and best-suited remedy to address the parties' on-going disputes and to determine the future rights and obligations of the parties under the DSSA and state administrative statutes. The district court committed no abuse of discretion.

## CONCLUSION

NNA respectfully urges this Court to affirm the judgment of the district court.

---

[30] *See also* AA at 80 ("Consistent with the jury's verdict [on Counterclaim Count I], the Court enters declaratory judgment on Counterclaim Count II in favor of [NNA and] . . . declares that Coyle . . . breached Amendment No. 2").

Dated: December 18, 2023       DORSEY & WHITNEY LLP

By _____
    Steven J. Wells
    Jennifer Coates
    Brock Huebner
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600

Attorneys for Appellee.

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Appellee Nissan North America, Inc. furnishes the following in compliance with Fed. R. Civ. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. Civ. P. 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 13,873 words.

Dated:  December 18, 2023       DORSEY & WHITNEY LLP

By */s/ Steven J. Wells*_____
Steven J. Wells
Jennifer Coates
Brock Huebner
 50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600

Attorneys for Appellee.

**CERTIFICATE OF SERVICE**

Steven J. Wells, counsel for Appellee Nissan North America, Inc. certifies that on December 18, 2023, he caused to be electronically filed with the Clerk of the United States Court of Appeals for the Seventh Circuit **Brief of Defendant-Appellee Nissan North America, Inc.**, using the Court's CM/ECF system, which shall send notification of this filing to all counsel of record.

/s/ *Steven J. Wells*
Steven J. Wells